*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 26, 2017

**VIA ECF AND HAND DELIVERY**

The Honorable Paul G. Gardephe
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States* v. *Glen Glover*,
               S1 15 Cr. 692 (PGG)

Dear Judge Gardephe,

      Sentencing in this matter is scheduled for February 2, 2017 at 2:30 p.m. The Government respectfully submits this letter in connection with that sentencing and in response to defendant Glover's memorandum of January 19, 2017.

      As the Court is aware from presiding over the trial in this case, the defendant made false statements to the United States government to conceal his and his co-defendant's unauthorized employment outside the Drug Enforcement Administration ("DEA") through at least December 2011. Glover was an investigative specialist with the DEA, and required to maintain a Top Secret national security clearance. However, the evidence at trial showed that Glover and a DEA colleague, co-defendant David Polos, operated an adult entertainment establishment, despite having failed to get or seek required DEA permissions to do so. These outside jobs posed serious issues from a national security perspective, including opening the defendants up to potential blackmail. To maintain their double lives, the defendants lied and made material omissions to government agencies and investigators repeatedly: in their national security forms, in follow-up in-person interviews with investigators regarding their own applications for continued national security clearance, and even in Polos's character reference interview for Glover. The jury found, based upon the evidence at trial, that Polos and Glover conspired with each other to make these false statements based on a shared understanding, without which their efforts to cover-up their roles at the adult entertainment establishment would have been less likely to succeed.

      For Glover's crimes, the United States Probation Office ("Probation Office"), in its Presentence Investigation Report ("PSR"), recommends a principal sentence of probation based,

in part, on its calculation of a 0-6 month Guidelines range under the United States Sentencing Guidelines (the "Guidelines").  The Government agrees that the Guidelines calculation provided by the Probation Office is correct.  Because of that Guidelines range, the Government respectfully requests that the Court impose a sentence that reflects the seriousness of the offenses the defendant committed.  We devote the remainder of this letter to this issue.

### The Defendant and the Offense Conduct

Defendant Glover was an investigative specialist at the DEA's New York field office, specializing in the sensitive technique of cellphone location tracking.  Over his long tenure in his position, Glover provide specialized technical support for the operations of the field office as well as of the Organized Crime Drug Enforcement Strike Force, an elite interagency task force in which Polos served as a supervisor.  (Tr. 173).  As part of his duties, Glover was occasionally deployed internationally, a necessarily sensitive undertaking requiring approval of the State Department and foreign government counterparts.  (Tr. 173-74).

In order to hold their positions at the DEA, Glover and his co-defendant were required to maintain security clearances at the Top Secret level.  (Tr. 83).  Maintaining those clearances required undergoing periodic reinvestigations. (Tr. 84-85). As the first step of the reinvestigation, the defendants were required to electronically complete SF-86 forms, which are detailed background questionnaires.  (Tr. 85-86).  Among other things, the defendants were required to list "all your employment activities" for the previous seven years.  (GX 101 at 12).  The applicants had to electronically certify the forms, and then execute and submit signature pages.  (Tr. 638).  Both the certifications and the signature pages required the applicant to attest "My statements on this form, and on any attachments to it, are true, complete, and correct to the best of my knowledge and belief and are made in good faith."  (GX 101 at 29; GX 102 at 33, 34, GX 103 at 3). The forms contained a warning to the applicant that false statements are criminally punishable.  (GX 101 at 29, GX 102 at 33).

After an applicant completes the SF-86 form, the DEA personnel section transfers the application to the Office of Personnel Management, which has its own investigators or contractors conduct a background investigation including an interview of the subject and references.  (Tr. 85, 88).  The application is then returned, together with the findings of the investigation, to the DEA for adjudication.  (Tr. 89-90).

In the summer of 2011, nearly a year after they began running Twins Go-Go Lounge, an adult entertainment establishment in New Jersey, both Glover and his co-defendant underwent reinvestigations.  Both made false statements in order to conceal their employment activities at the Lounge, and then made additional false statements when interviewed by investigators.  (GX 101 at 10-11; GX 102 at 12-14).

Glover was interviewed by a background investigator as part of the reinvestigation process on August 18, 2011, and went over his answers on the form.  Not only did he not mention his employment at the Lounge, Glover affirmatively denied any additional employment.  During this interview, the investigator discovered that Glover had failed to list on his SF-86 as

self-employment his ownership interest in a dog grooming business run by his wife. (Tr. 1119-20). The investigator—who remembered the interview due to the unusual circumstance of an undisclosed dog grooming business—then specifically asked Glover whether there was any other self-employment, and Glover said no. (Tr. 1129). For his part, Polos supported Glover's lies as part of a conspiratorial understanding the two defendants shared; he omitted all mention of the Lounge when asked by a government investigator what Glover did in his spare time during an August 18, 2011 character reference interview for Glover. (Tr. 1187).

Glover was the principal owner and manager of the club, worked multiple weekly shifts there, oversaw its renovation, and monitored the club by day both remotely and in person.[1] Glover's extensive interest in and work at the club gave him ample motive to lie throughout his security reauthorization. As an initial matter, he was supposed to have obtained prior approval for outside employment. Such requests are rarely granted, and neither Glover nor Polos ever made such a request. This significant omission would quickly have become apparent if either defendant had been truthful on their SF-86 forms. (Tr. 133, 181, 185, 447-449, GX 301). Further, had the defendants disclosed their unauthorized outside employment on their SF-86s, the matter would have been referred to the Office of Professional Responsibility to investigate and then escalated to the head of Personnel Security for the entire DEA. (Tr. 126-27, 137-38). The investigation would have posed a risk of the revocation of their security clearances, especially given the risks of illegal activity posed by the club, and could also have jeopardized Glover's financial investment in the club. (Tr. 128-30, 139-40).

As the evidence at trial showed, the risks of illegal activity became evident over the course of the defendants' management of the Lounge. The Lounge operated off the books for approximately its first year, resulting in the filing of inaccurate tax returns for tax year 2011; those tax returns were prepared at Glover's direction and were signed by Glover. (Tr. 416-417, 427). In addition, multiple employees of the Lounge reported to Glover incidents of drug use at the club and evidence of sexual activity in the stalls in which patrons would receive lap dances for money. (Tr. 285, 304-05, 879). The risk of the DEA learning of the defendants' involvement with the Lounge thus merged with the risk of the DEA's learning of their proximity to these illegal activities.

### The Seriousness of the Offense

The Government considers this offense to have been quite serious and the need for general deterrence to be pronounced. Though, as the defendant stresses, it was not a crime of violence, the defendant's offense impaired an important process for ensuring the reliability of public servants placed in positions of extreme trust.

First, the process that the form initiated – the national security background check reauthorization – is a vital endeavor that Glover's false statements compromised. The

---

[1] The evidence at trial showed that Glover's management of the Lounge included actions taken during scheduled working hours, and that on one occasion Glover apparently misused sick leave in order to perform errands for the club. (*See* GX 323 at 7; GX 601 at 211).

background check is the primary means the Government has to ensure that officials in Glover's position remain worthy of their access and responsibilities, and that national security information they have access to remains safeguarded. The task of making that determination is not left to the subject of the background investigation himself, for obvious reasons. By submitting forms with false information on them, Glover and his co-defendant effectively robbed the officials that make that determination of their ability to do so in an informed fashion. They prevented investigators from knowing about areas that would have been of greatest interest to them: possible susceptibility to blackmail, for example, and employment at a type of establishment that tends to attract other illegal activities such as drug use and prostitution.

It is unlikely that Glover would have been able to continue in his role performing sensitive technical operations for the DEA as well as in his employment at the club had these questions been answered truthfully. Regardless of the outcome, however, Glover's actions seriously damaged the security clearance reauthorization process. His job – a job that involved sensitive technical assistance in support of law enforcement operations domestically and abroad – is too important for Glover to have decided unilaterally that the investigators and decision-makers did not deserve to have the truth. Glover and his co-defendant opened the DEA up to needless risk, having deliberately undermined the process designed to police and limit such risk.

Second, the Court should consider that Glover's lie was not merely a single lie. The offenses of conviction were not executed solely in the seconds it took for Glover to check the wrong boxes or the minutes it took to fill out the entire SF-86 form. Rather, Glover and his co-defendant engaged in a scheme that took months to play itself out, involving both men's security clearances and a joint, sustained cover-up that produced active lies and omissions at *eight* key points: (1) Glover's failure to mention his involvement in the Lounge in his SF-86 form; (2) Glover's sending in his signature page the next day containing the false affirmation; (3) Glover's failure to mention his involvement in the Lounge in his in-person interview; (4) Polos's omission of the lounge in his character reference interview for Glover; (5) Polos's failure to mention his work at the Lounge in his form, (6) Polos's lie about his relationship with the dancer in the same form; (7) Polos's failure to mention the Lounge in his in-person interview, and (8) Polos's failure to mention his relationship with the dancer in the same in-person interview. The scheme of which the jury found the defendants guilty required coordination and time. The prolonged, deliberate nature of the scheme makes it more serious than an isolated, off-the-cuff falsehood, and the Court should factor that into its sentencing calculus as well.

Third, the seriousness of the conduct , as outlined above, cries out for a measure of general deterrence, particularly given Glover's role in law enforcement and the Top Secret level of the clearance sought. Thousands of federal employees undergo national security authorizations and reauthorizations every year, and as the trial demonstrated, the process requires employees to be fully honest in their responses. Without honest responses, both in writing and during the in-person interview, investigators are unable to assess potential security risks or decide what might require further investigation. Accordingly, when, as here, a government employee with access to highly sensitive information lies repeatedly throughout the process and conspires with a colleague to tell

Hon. Paul Gardephe                                                                                                          Page 5
January 26, 2017

further lies, the Court's sentence must send the appropriate message that such conduct cannot be tolerated.

      We therefore ask that the Court impose a sentence reflecting the seriousness of defendant Glover's conduct.

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney

                by:   /s/
                              Martin S. Bell
                              Paul M. Monteleoni
                              Andrew D. Goldstein
                              Assistant United States Attorneys
                              (212) 637-2467/2219/1559

cc:  All Counsel (via e-mail and ECF)